## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **11-CR-866-LTS** |
| | **REDACTED MEMORANDUM** |
| **DANIELA CASADEI, Defendant.** | |

## DANIELA CASADEI'S REDACTED MEMORANDUM IN AID OF SENTENCING

Barry Coburn, Esq.
COBURN & GREENBAUM, PLLC
1710 Rhode Island Ave., NW
Second Floor
Washington, DC 20036

99 Hudson Street
Fifth Floor
New York, NY 10013
barry@coburngreenbaum.com
(202) 643-9472

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................ 1

NATURE AND CIRCUMSTANCES OF THE OFFENSE AND DEFENDANT'S
CHARACTERISTICS AND HISTORY ............................................................ 2

FACTORS INFLUENCING THE SENTENCE TO BE IMPOSED.................... 7

AVOIDING UNWARRANTED DISPARITIES ................................................ 10

LOSS AMOUNTS ...................................................................................... 21

RESTITUTION ........................................................................................... 22

CONCLUSION ........................................................................................... 23

**INTRODUCTION**

Defendant Daniela Casadei is among the few indicted Swiss bankers and professionals who have voluntarily surrendered, admitted their guilt, and cooperated. All other similarly situated defendants have been sentenced to a period of probation or time served, including Ms. Casadei's co-defendant, Fabio Frazzetto. ████████████████████████ ████████████████████████████████████████████████

████████ No Swiss professionals or bankers of whom we are aware have been sentenced to any period of incarceration. We respectfully submit that a period of probation or time served is appropriate here.

The United States government's prosecution of Swiss private banking has been transformative. The use of Swiss private banking to evade United States taxes is essentially defunct. Scores of banks and the Swiss government itself have entered into agreements with the United States. Offending United States as taxpayers took advantage of the Internal Revenue Service Voluntary Disclosure Program ("VDP") to avoid criminal prosecution. Some individual indicted Swiss bankers, such as Ms. Casadei, surrendered to and cooperated with the United States. Others elected to remain in Switzerland. Other Swiss professionals, including senior managers and other supervisory personnel, likely never will suffer criminal prosecution.

Ms. Casadei's surrender to face this prosecution, ████████████████ ████████ and acceptance of responsibility demonstrate the sincerity of her remorse.

████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████ ████████████████ Given all this and the posture of similarly situated Swiss

professionals, our submission is that the advisory guidelines range of 30 to 37 months is inappropriate here and that – as the Honorable Judge Rakoff found with respect to Ms. Casadei's codefendant -- a period of probation or time served would be "sufficient, but no greater than necessary" to accomplish the goals of sentencing.  18 U.S.C. § 3553(a).  We discuss the salient Section 3553(a) factors below.

## NATURE AND CIRCUMSTANCES OF THE OFFENSE AND DEFENDANT'S CHARACTERISTICS AND HISTORY

Ms. Casadei lives with her sister, Laura Casadei, in Zurich, Switzerland.  Until recently, she and her sister lived in the same house in which they grew up– a single floor of a house that had been rented by her parents when she and her sister were young.

Ms. Casadei is a Swiss and Italian national.  She is of Italian descent.  Her parents moved to Switzerland around 1960 because of the better employment opportunities compared to those in Italy.  Her father worked as an HVAC repairman.  Her mother cleaned homes.  Presently, Ms. Casadei's parents live in Italy.  Both make efforts to visit her when they can.

Ms. Casadei was raised in Switzerland.  After obtaining the equivalent of a high school degree in Italy, she took a job working in a chocolate factory in Kilchberg, Switzerland, operated by the Lindt & Sprüngli chocolate company.  She tested and packaged chocolates as a factory worker.  She worked at the chocolate factory from 1980 until 1986.

Ms. Casadei then traveled to San Diego, California, to work on her English skills.  She always had an interest in English and so was determined to improve her fluency.  She attended a program for three months in San Diego, followed by travel around the United States from October 1986 until April 1987.

When she returned to Switzerland, Uebersee Bank, a branch of AIG, a large Swiss bank, hired her as a clerk.  She worked in the account-opening department in a back-office position.

Subsequently, seeking a new job, particularly one that would give her an opportunity to speak English, Ms. Casadei joined Bank Julius Baer in May 1989 ███████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████ This was when she first became familiar with private banking.  She was required to protect the confidentiality of client information as a matter of Swiss law.

█████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

████████████████████████

████████████████████████████████████████

Ms. Casadei was promoted in 1999 to the position of relationship manager on the BJB North America team.  In 2002, Ms. Casadei was moved to BJB's Premium Small Clients Division for several years.  In 2005, the Premium Small Clients Division was disbanded, and Ms. Casadei rejoined the North America team.  ███████████████████████

██████████████████████████████████████████

██████



██████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████

█████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████

Ms. Casadei was indicted on October 11, 2011.  Shortly afterwards, she learned of the

indictment from her supervisor, Gustavo Raitzin.  Mr. Raitzin called her at around 5:00 a.m. on

October 12th.  That day, Mr. Raitzin convened a special meeting of the North America team.  He

informed the team that both Ms. Casadei and Mr. Frazzetto had been indicted.  Ms. Casadei

recalls asking Mr. Raitzin why she was indicted, and Mr. Raitzin responded that he did not

know, that it "just happened." She then went online to look up the definition of an indictment.

     Ms. Casadei was told that she could not be a relationship manager anymore and that she

could no longer have client contact. BJB made her an assistant and placed her in a back-office

position. Aside from Ms. Casadei and Mr. Frazzetto, no other employees of BJB were indicted.

The indictment of Ms. Casadei was widely publicized, reported in such media outlets as the *New

York Times* and *The Financial Times*, among others.[3]

████████████████████████████████████

████████████████████████████████████

███████████

     Ms. Casadei remains restricted to Switzerland, except for occasional travel out of the

country in connection with this case or, as this Court has permitted, to see her parents in Italy.

She and her parents remain close – they still talk over the telephone on a weekly basis. This

case, however, has been an incredible strain. Her parents recently have had more difficulty

traveling to Switzerland to see their daughter, as they are now somewhat older than they were

when this case began. Her father is now 74, and her mother is 77.

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

---

[3]*See, e.g.,* David Jolly, "US Tax Evasion Case Touches Julius Baer," THE NEW YORK TIMES, Oct. 12, 2011 https://dealbook.nytimes.com/2011/10/12/u-s-tax-evasion-case-touches-julius-baer/ "Ex-Julius Baer bankers charged in US tax probe" https://www.ft.com/content/61f44c82-f4ae-11e0-a286-00144feab49a;



She had sustained a severe fracture to her right leg in 2015, resulting in two weeks of hospitalization in Zurich, restricting her mobility to crutches, which caused significant physical pain. *See* PSR ¶ 65. Both she and Mr. Frazzetto also dealt with obstacles in attempting to fly into the United States to render their pleas of guilty. She and Mr. Frazzetto were held for a day by Customs and Border Patrol in Toronto, Canada, because of a misunderstanding about the nature and purpose of their travel.

## FACTORS INFLUENCING THE SENTENCE TO BE IMPOSED

Applicable factors governing formulation of the sentence to be imposed, codified at 18 U.S.C. § 3553(a)(2), include four components: (A) reflecting the seriousness of the offense, promoting respect for the law, and providing just punishment; (B) affording adequate deterrence; (C) protecting the public from further crimes of the defendant; and (D) providing the defendant with needed educational or vocational training, medical care, or other correctional treatment.

Judge Rakoff, who sentenced Ms. Casadei's codefendant and two other Swiss banking

professionals in this District, observed the institutional nature of this offense:

> The Swiss banking situation [ . . . ] has lent itself to facilitating tax evasion,
> not just by Americans, but by all people all over the world, to a point where
> it has essentially been, for many decades, the subject of jokes and ridicule.
> And the fact that respect for the sovereignty of Switzerland made it difficult
> for any country to take effective action against this unfortunate, if not
> pernicious practice, is not to excuse it in any moral sense.

Amrein Sent. Tr. 6, Ex. 2.  Judge Rakoff's observations are telling, both about the widespread,

national scale of the conduct as well as the notion that its institutional character is in no way a

moral (or legal) excuse.

As for promoting respect for the law as well as deterrence, the very public and effective

investigation by the United States government has all but eliminated Switzerland's private

banking industry.  That institution, which had long been used to shield United States taxpayer

income, has been effectively dismantled.[4]

---

[4] *See, e.g.,* Ralph Atkins and Laura Noonan, "The decline of the Swiss private bank," THE
FINANCIAL TIMES, Dec. 11, 2017, https://www.ft.com/content/01927da8-d451-11e7-a303-
9060cb1e5f44 ("Thanks to the US-led global clampdown on tax evasion, however, the days are
long gone when Swiss bankers could prosper by simply assisting rich clients hide assets."); "A
banking centre seeks to reinvent itself," THE ECONOMIST, (Feb. 24, 2018),
https://www.economist.com/news/finance-and-economics/21737255-switzerland-embraces-
digital-currencies-and-crypto-entrepreneurs-banking-centre ("Switzerland's famous banking
secrecy is falling to a global assault on money-laundering and tax."); David Reid, "Swiss
banking secrecy nears end following new tax rules," CNBC, (Jan. 2, 2017),
https://www.cnbc.com/2017/01/02/swiss-banking-secrecy-nears-end-following-new-tax-
rules.html; Kara Scannell, "Wegelin guilty plea rattles Swiss banks," THE FINANCIAL TIMES,
(Jan. 10, 2013) https://www.ft.com/content/75d4df22-5a4d-11e2-a02e-00144feab49a (noting
that the indictment and conviction of Wegelin "sent shockwaves through Switzerland's banking
sector.").

The swath of indictments and the attendant publicity accomplished substantial deterrence.
The United States acknowledged this deterrent effect in the Department of Justice's February
2016 announcement[5] regarding Ms. Casadei's and Mr. Frazzetto's guilty pleas:

> In taking responsibility for their actions, Bank Julius Baer has agreed to
> cooperate and pay a substantial penalty for their role in circumventing
> offshore disclosure laws. The agreement – as well as the guilty pleas of
> client advisors Daniela Casadei and Fabio Frazzetto – **sends a strong**
> **message to the international banking community as well as U.S.**
> **taxpayers who think they can outsmart the system by hiding their**
> **money in these international banks. The consequences of not reporting**
> **your foreign accounts and paying the taxes you owe will be significant**
> **for those who do not heed the warnings that agreements like this yield.**

Emphasis added. In fact, a contemporaneous Justice Department Tax Enforcement bulletin[6]
stated that the Tax Division "shattered Swiss banking secrecy" in its offshore banking
prosecutions.

The risk of recidivism is non-existent here. The use of Swiss private banking to assist in
evasion of United States taxes no longer exists. Moreover, Ms. Casadei no longer manages or
interacts with clients. Instead, she now provides professional training to BJB employees.
Incarcerating her would not advance any rehabilitative or other purpose.

---

[5] Dept. of Justice, Office of Public Affairs, Criminal Charges Filed Against Bank Julius Baer of
Switzerland with Deferred Prosecution Agreement Requiring Payment of $547 Million, as Well
as Guilty Pleas of Two Julius Baer Bankers (Feb. 4, 2016), https://www.justice.gov/usao-
sdny/pr/manhattan-us-attorney-announces-criminal-charges-against-bank-julius-baer-
switzerland.

[6] David B. Massey, Daniel W. Levy, and Jason H. Cowley, "UBS, Wegelin, and Offshore
Banking Prosecutions: The Power of General Deterrence" TAX ENFORCEMENT II Vol. 61, No. 3
(May 2013), available at: https://www.justice.gov/sites/default/files/usao/legacy/2013/04/23/
usab6103.pdf.

## AVOIDING UNWARRANTED DISPARITIES

To our knowledge, no Swiss professional has received a custodial sentence in connection with these tax evasion cases.[7]  Some even received non-prosecution agreements, while others have been acquitted or received sentences of time served or probation.  All three Swiss professionals recently sentenced in the Southern District of New York received sentences of time served.  That includes Ms. Casadei's co-defendant, Mr. Frazzetto (No. 11-CR-866-JSR).  The others sentenced in this District are Peter Amrein (No. 13-CR-972-JSR) and Edgar Paltzer (No. 13-CR-00282-JSR), both of whom occupied positions of far more substantive responsibility at their respective banks than Ms. Casadei.

Part (a)(6) of 18 U.S.C. § 3553 provides that "The court, in determining the sentence to be imposed, shall consider [ . . . ] the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  The primary purpose of § 3553(a)(6) "was to reduce unwarranted sentence disparities nationwide." *United States v. Wills*, 476 F.3d 103, 109 (2d Cir. 2007).  Examination of these other cases demonstrates that a non-custodial sentence would avoid unwarranted disparities.  Conversely, a custodial sentence would create an unwarranted disparity.

The most pertinent sentencing is that of Mr. Frazzetto, Ms. Casadei's co-defendant.  Judge Rakoff sentenced Mr. Frazzetto to a period of time served and a $6,000 fine.  In

---

[7] Bradley Birkenfeld, a United States citizen, is the only Swiss banking professional of whom we are aware who received a sentence of imprisonment.  Mr. Birkenfeld was an employee of UBS and is credited for being the principal whistleblower that initiated the U.S. investigation of Swiss private banking.  It appears, however, that Mr. Birkenfeld received a sentence of incarceration because he failed to disclose his own involvement in assisting in tax evasion.  *See* Transcript of Sentencing at 12, *United States v. Birkenfeld*, No. 08-cr-60099 (Aug. 21, 2009), ECF No. 82 (statement of DOJ attorney, Kevin Downing) ("[B]ut for Mr. Birkenfeld failing to disclose his involvement with the [UBS] fraud and the U.S. citizens that he aided and assisted in tax evasion, I believe we well would have non-prosecuted Mr. Birkenfeld.").

pronouncing Mr. Frazzetto's sentence, Judge Rakoff made the following observation,

referencing the acquittal of Stefan Buck, another Swiss financial professional, who proceeded to

trial:

> I presided over the trial of Mr. Buck and the jury acquitted Mr. Buck, but in my view, it wasn't because they didn't think Mr. Buck was not guilty. I think it was obvious that Mr. Buck was guilty. What they felt was that there were others involved that were more guilty, more perfidious, more responsible for this long-term, ongoing illegal misconduct that can only be described ultimately as disgusting.
>
> But in the context of that misconduct, Mr. Frazetto [sic] was a relative small fry and he came forward and he admitted his guilt and was helpful to the government. Therefore, I think time served is the appropriate sentence.

Frazzetto Sent. Tr. 4, Ex. 1. These observations apply with equal force to Ms. Casadei.

Judge Rakoff also sentenced Messrs. Amrein and Paltzer. Mr. Amrein was a client

advisor and external asset manager in Zurich. Amrein Plea Tr. 21, ECF No. 12. Judge Rakoff

regarded him as significantly more culpable than Mr. Frazzetto. Amrein Sent. Tr. 3-4, Ex. 2

("What gives me pause, of course, is that [Mr. Amrein's involvement] was also substantial. It

wasn't as great as some. It wasn't as little as the gentleman [Mr. Frazzetto] I just sentenced to

time served."). Judge Rakoff observed that Mr. Amrein was different in that his "legal training, I

think in many ways made him sensitive to just how repulsive this practice was and is." *Id.* at 7.

On the point of relative culpability, Judge Rakoff made note of other individuals,

particularly United States taxpayers: "So in the Court's view, the most culpable people in this

entire situation are the U.S. taxpayers who knowingly, willfully, intentionally, and in disregard

not just of the law, but of the most elementary regard for their fellow citizens chose to evade

taxes through the device of these secret Swiss bank accounts." Amrein Sent. Tr. 5-6. He

expressed puzzlement: "I've never understood why so many of these taxpayers wind up getting

off the hook." *Id.* at 6.  Judge Rakoff ultimately sentenced Mr. Amrein to one year of probation and a fine of $5,000.

On the same day Judge Rakoff also sentenced Edgar Paltzer.  He regarded Mr. Paltzer "by a material measure" as the most culpable of the three Swiss professionals before him that day.  Paltzer Sent. Tr. 2, Ex. 3.  Yet, ultimately, the court credited Mr. Paltzer's cooperation and imposed a sentence of time served and a fine of $75,000.  Paltzer Sent. Tr. 10.  In part, the court focused on the stigma that Mr. Paltzer faced in Switzerland for voluntarily surrendering to U.S. authorities (as Ms. Casadei did).  Mr. Paltzer proffered to the court in his sentencing memorandum that he faced social stigma and judgment in Switzerland for pleading guilty.  Judge Rakoff acknowledged this stigma, observing:

> To think that someone who, when confronted with their guilt in this regard, promptly admits their guilt and agrees to provide the government with truthful information so that the government can bring the justice of others involved in this shameful practice, is somehow repulsive or deserving of criticism, is something this Judge at least cannot understand at all.

Paltzer Sent. Tr. 5-6, Ex. 3.  The negative judgment that Mr. Paltzer faced in Switzerland for cooperating further illustrates the pervasive, institutional character of the conduct of the Swiss private banking industry.

No Swiss professionals charged in connection with the United States' investigation into Swiss offshore accounts have been given custodial sentences.  Consider the following Swiss professionals sentenced in other districts in similar cases:

### Michele Bergantino -- *U.S. v. Bergantino*, No. 1:11-CR-95-003 (E.D.Va.)

Mr. Bergantino was one of a group of defendants in a case filed in the United States District Court for the Eastern District of Virginia against several employees or business associates of Credit Suisse.  He was a private banker with Credit Suisse from 1983 to 2009.  His

background bears much similarity to that of Ms. Casadei.  Both Ms. Casadei and Mr. Bergantino had no college or university degree.  Bergantino Sent. Memo, ECF No. 104, at 6.  Mr. Bergantino, like Ms. Casadei, started with his bank at a low-level position before eventually becoming a relationship manager.  *Id.* at 4.  Like Ms. Casadei, Mr. Bergantino was a relationship manager that inherited nearly all of his clients from other relationship managers.  *Id.* at 4.  Mr. Bergantino was discouraged from overtly discussing taxes with customers.  *Id.* at 5.

Mr. Bergantino voluntarily surrendered in the United States, following his indictment. His presentence report calculated a Federal Sentencing Guidelines offense level of 21, corresponding to a range of 37 to 46 months of incarceration.  He pleaded guilty and cooperated. He was sentenced to two years of unsupervised probation and a $10,000 fine.

### Martin Lack -- *U.S. v. Lack*, No. 11-CR-60184 (S.D. Fla.)

Mr. Lack was a client advisor and executive director for North America with UBS, a much higher-level bank employee than is Ms. Casadei.  He pleaded guilty and cooperated.  His total offense level was 21, corresponding to a range of 37 to 46 months' incarceration.  He was sentenced to five years' probation and a $7,500 fine.

In contrast with Ms. Casadei, Mr. Lack, on at least one occasion, "attempted to dissuade a United States customer from entering into the IRS's voluntary disclosure program."  Lack Plea Hrg, ECF No. 42, Tr. 33,.  He also would travel to the United States to receive cash from United States customers to deposit in the customer's offshore bank account.  *Id.*  Ms. Casadei never engaged in any such conduct.

### Renzo Gadola -- *U.S. v. Gadola*, No. 10-CR-20878 (S.D. Fla)

Mr. Gadola was a client advisor with UBS from 1995 to 2008.  After that, he became a self-employed asset manager from 2008 to 2010.  He also was a former United States resident,

having earned his undergraduate degree from Jacksonville University and an M.B.A. from

George Washington University.

      Unlike Ms. Casadei, Mr. Gadola did not voluntarily surrender to United States

authorities.  He was arrested.  In November 2010, Mr. Gadola flew from Switzerland to the

United States to meet with "various individuals with whom he worked as an independent

investment advisor in his own business."  Renzo Gadola Sent. Memo., ECF No. 54 at 2.  While

he was in the United States, Mr. Gadola met with a United States taxpayer in Miami and helped

persuade the taxpayer not to disclose the taxpayer's undeclared account.  Mr. Gadola was

arrested following this meeting with the taxpayer. *Id.* at 3.

      Mr. Gadola pleaded guilty and cooperated with law enforcement authorities after his

2010 arrest.  He faced a total Guidelines offense level of 12, which corresponds to 10-16 months'

incarceration.  The court sentenced him to five years' probation with no fine.

      In addition, the following Swiss banking professionals all faced significantly higher

Guidelines sentences than Ms. Casadei.  All received non-custodial sentences:

### Susanne D. Rüegg Meier – *U.S. v. Rüegg Meier*, 1:11-CR-00095 (E.D.Va.)

      Ms. Rüegg-Meier was another defendant in the above-referenced case in the Eastern

District of Virginia filed against various Credit Suisse employees.  Ms. Rüegg-Meier was a

relationship manager and supervisor on Credit Suisse's North American desk located in Zurich

from 2001 to 2011.  Gov't Sent. Memo., ECF No. 131 at 2.  Ms. Rüegg-Meier visited the United

States and "received instructions for transferring funds, solicited additional deposits to the

clients' undeclared accounts, promoted Credit Suisse's investment products, and, on a smaller

scale, solicited prospective clients to open accounts at Credit Suisse in Switzerland and to

transfer assets into those accounts." ECF No. 131 at 2.

14

Ms. Rüegg-Meier was indicted in July 2011. In July 2017, she voluntarily surrendered and pleaded guilty.

At sentencing, the government sought a sentence of thirty-eight months of imprisonment. The government focused on Ms. Rüegg-Meier's role as a supervisor and manager: "[Rüegg-Meier] was a supervisor of these folks, the other relationship managers. She was the head of the Zurich desk. So it was extensive, her management and her role. The offense was extensive." Rüegg-Meier Sent. Hrg, ECF No. 141, Tr. 15; Tr. 25 (referencing Ms. Rüegg-Meier's management of the office),. The Court, however, concluded that a Guidelines sentence would be excessive, and, accordingly, sentenced Ms. Rüegg-Meier to five years of unsupervised probation. The Court commented on the institutional nature of the offense:

> THE COURT: Swiss banking laws are very strict, and they would never reveal information about it. Ms. Rüegg-Meier did not create that scheme.
>
> [ . . . ]
>
> That program was developed by the banks. You have secured a judgment against the banks or some consent agreement with the banks. These individuals were basically following orders working in a company. This is not something she organized. I understand your theory about the organizational structure, but she is not the one who created the Swiss banking scheme. That's been around a long, long time before she was even conceived.

Rüegg-Meier Sent. Hrg Tr. 14-15. The Court also noted, "There are many taxpayers who entered into the voluntary IRS program who were not prosecuted, who were allowed to pay their taxes. There's no similar program for people who worked for the bank." Rüegg-Meier Sent. Hrg Tr. 16. In rendering its sentence, the court recognized that although Ms. Rüegg-Meier was a manager, she was an employee in a much larger scheme:

> Your role in the offense as a manager of other relationship managers was to do the bank's business, and you worked very hard to become a banker and to move up in the organization. But it was not your model that was the criminal mode that we're here before the Court on. This is all the work of

> Credit Suisse.  Credit Suisse has been held accountable, but Credit Suisse
> can't go to jail.

Rüegg-Meier Sent. Hrg. Tr. 37.  Further, in determining that a non-custodial sentence was

appropriate, the Court noted that Ms. Rüegg-Meier voluntarily surrendered when she did not

have to do so, that she would potentially face consequences under Swiss law, and that Credit

Suisse, not Ms. Rüegg-Meier, was the creator of the tax evasion enterprise, all observations that

apply equally to Ms. Casadei.  *Id.* at 37-38.

### Andreas Bachmann -- *U.S. v. Bachmann*, 1:11-CR-95-007 (E.D.Va.)

Mr. Bachmann was a private banker with Credit Suisse from 1994 to 2006, then an asset

manager with Neue Zürcher Bank from 2006 to 2009, and then a co-founder and asset manager

of EVT partners from 2009 to present.

Mr. Bachmann's conduct differed from that of Ms. Casadei.  He, in particular, engaged in

cash transactions in the United States on behalf of United States customers.  Bachmann

Statement of Facts, ECF No. 18, at 9.  Some United States customers would request that Mr.

Bachmann either provide them with cash as withdrawals from their undeclared accounts or take

cash from them to deposit in their undeclared accounts.  *Id.*  On at least one occasion, Mr.

Bachmann received cash from a United States customer for deposit in an undeclared account.

On the one occasion identified in his statement of facts, Mr. Bachmann carried $50,000 cash

from the United States back to Switzerland.  *Id.* at 10.

Further, unlike Ms. Casadei, Mr. Bachmann appeared to continue servicing undeclared

accounts after 2009.  *Id.* at 11.  Ms. Casadei strongly encouraged her clients to participate in the

Voluntary Disclosure Program in 2009, the result of which, ultimately, led to her own

indictment.  However, in 2009, Mr. Bachmann and four other asset managers decided to form a

new business and brought their United States clients with them.  "Within six months of

16

formation, the assets under management at [Mr. Bachmann's new business] grew from approximately CHF 130 million to CHF 400 to 500 million." *Id.* at 12.  It appears that it was not until 2011 that Mr. Bachmann began encouraging clients to enter the VDP.  *Id.*

Mr. Bachmann's advisory Guidelines range was 46 to 57 months.  He received a sentence of probation.  In imposing this sentence, the Court noted that it had found "no reason" to put him in jail. Bachmann Sent. Hrg, ECF No. 79., Tr. 7:17Even though the Court determined that Mr. Bachmann's offense was "a very serious matter," the court determined that Mr. Bachmann had "accepted responsibility" and had come to the United States of his "own free will" *id.* at 7:17-20, as did Ms. Casadei.

### Christos Bagios -- *United States v. Bagios*, No. 12-CR-60260 (S.D. Fla.)

Mr. Bagios worked as a Senior Relationship Manager for UBS from 2005 to 2008. Bagios Statement of Facts, ECF No. 106.  He then also became the Head Relationship Manager for the East Coast from 2009 to 2012.  Unlike some other Swiss professionals in these cases, he did not voluntarily surrender to the government.  Instead, he was arrested.  He ultimately pleaded guilty and cooperated with law enforcement.  The government contended that Mr. Bagios' total Guidelines offense level was 23 (46 to 57 months).  The Court sentenced Mr. Bagios to time served (37 days) and no fine.

Mr. Bagios' conduct was more egregious than Ms. Casadei's in a number of respects. For example, Mr. Bagios "discouraged a customer from repatriating the funds in [an undeclared account] to the United States by telling the customer about the fees and taxes that he estimated the customer would owe if such an account was declared."  Bagios Statement of Facts, ECF No. 106.  Further, he occupied a significantly higher level of responsibility at UBS than Ms. Casadei held with Julius Baer.  Mr. Bagios had advised clients to take affirmative actions to better

conceal their income. He advised them to open an undeclared "black" account with UBS but also maintain a fully declared "white" account. ECF No. 106. "The purpose of maintaining the declared 'white' account was so that United States authorities would not suspect that the customer also had an undeclared account, thereby helping to conceal the undeclared account." *Id.* He met with clients in the United States to provide advice about "white" and "black" accounts. *Id.* In 2009, after UBS began closing undeclared accounts, Mr. Bagios "informed a customer that he could potentially move the funds in his undeclared account into an undeclared account at a Swiss cantonal bank." *Id.* Ms. Casadei did not engage in any such activity.

### Josef Dörig -- *United States v. Dörig*, No. 1:11-CR-95-008 (E.D. Va.)

From 1972 to 1997, Mr. Dörig was the president, CEO, and Chairman of the Board of a Credit Suisse subsidiary. Since 1997, Mr. Dörig was the principal of Dörig Partner AG. Mr. Dörig's company, Dörig Partner AG, was created for purposes of assisting Credit Suisse clients in establishing structured accounts. ECF No. 29 at 5. Dörig Partner AG was created to appear to be a wholly independent entity but, in reality, it was a fiduciary of Credit Suisse. *Id.* at 6. As a principal of Dörig Partner AG, Mr. Dörig led efforts to create sham corporations to conceal assets of United States taxpayers. *Id.* at 7-8.

Following entry of a guilty plea and cooperation with law enforcement, Mr. Dörig faced an advisory Guidelines range of 70 to 87 months. He was sentenced to 5 years' unsupervised probation and ordered to pay a fine of $125,000.

While Ms. Casadei has pleaded guilty to advising a client to open a structured account, she never occupied a leadership position remotely analogous to that of Mr. Dörig. Moreover, her conduct pales in comparison to the extensive pattern of conduct engaged in by Mr. Dörig.

**Hansruedi Schumacher -- *U.S. v. Schumacher*, No. 09-CR-60210 (S.D. Fla)**

Mr. Schumacher was Regional Market Manager with UBS from 1995 to 2002 before joining Neue Zürcher Bank as an asset manager from 2002 to 2009. He pleaded guilty and cooperated with the government. His total offense level was 25, which provides a range of 57 to 71 months. He was sentenced to five years' probation and a $150,000 fine.

Mr. Schumacher overtly "encouraged the use of Swiss bank secrecy for U.S. persons to commit tax evasion." Schumacher Statement of Facts, ECF No. 27. He "encouraged U.S. clients to not report their unreported Swiss account income or asset to the IRS" and "encouraged U.S. taxpayers to mislead the IRS about their holdings." *Id.* at 3-4.

Mr. Schumacher's conduct was far more overt than that of other Swiss bankers referenced here, and quite a bit more sophisticated. As noted in the factual recitation at Mr. Schumacher's plea hearing, "Schumacher and another co-conspirator advised [a client] to transfer her mother's assets to an account in the name of Schumacher's father in order to conceal these assets from the IRS." Schumacher Plea, ECF No. 30, Tr. 28. Further "[Schumacher] and another co-conspirator created Klaerly-Stiftung, a fraudulent entity that was purportedly owned by Schumacher's father." *Id.*; *id* at 29:9-11 (affirming the truth and accuracy of the government's factual proffer).

It is worth noting that the government pointed out the peril Mr. Schumacher faced by cooperating. Gov't Sent. Memo, ECF No. 34. The government highlighted that "Swiss bank secrecy laws criminalize the dissemination of account information" and that "Swiss law also proscribes 'economic espionage.'" *Id.* at 8. The government further observed that the "prospect of prosecution in Switzerland is not hypothetical," citing several news articles reporting the

19

consequences that Swiss bankers faced in Switzerland when cooperating with U.S. law enforcement. *Id.* at 9. These observations apply to Ms. Casadei as well.

Several other Swiss professionals implicated in cross-border tax cases, Michel Guignard, Martin Liechti, and George Marti, received non-prosecution agreements.[8] Finally, Raoul Weil and Stefan Buck (mentioned above) both went to trial were both acquitted, largely – as Judge Rakoff pointed out – because of concern about their low levels of responsibility at their respective banks, compared with others who were not charged.[9]

Ms. Casadei's conduct compares favorably with above-named defendants on nearly every dimension. She was not a decision maker with BJB. She started out as a clerical employee and, at the time of the conduct to which she has fully and completely admitted responsibility, occupied the lowest, non-supervisory rung within the BJB group of relationship managers. She was a rank-and-file employee. She principally was assigned the smallest accounts by her supervisors or otherwise inherited accounts from other members of her team.

---

[8] *See, e.g.*, M. Liechti Non-Prosecution Agreement, *United States v. Weil*, No. 08-cr-60322 (S.D. Fla. July 2, 2008) (ECF No. 47-5); Declaration of Aaron R. Marcu in Support of Raoul Weil's Motion to Compel the Government to Immediately Disclose All Brady and Giglio Material and Produce a Bill of Particulars ¶ 12, *United States v. Weil*, (filed May 23, 2014), ECF No. 47-1 (noting government's production of M. Guignard Non-Prosecution Agreement); Nathan Hale, Ex-UBS Exec Found Not Guilty in Tax Evasion Trial, Law360 (Nov. 3, 2014), https://www.law360.com/articles/592773/ex-ubs-exec-found-not-guilty-in- tax-evasion-trial (noting G. Marti's non-prosecution agreement with the government).

[9] *See* Judgment of Acquittal, *United States v. Weil*, No. 08-cr-603322 (S.D. Fla. Nov. 3, 2014), ECF No. 188; Judgment of Acquittal, *United States v. Buck*, No. 13-cr-282-JSR (S.D.N.Y. Nov. 27, 2017), ECF No. 111.

**LOSS AMOUNTS**

The Guidelines calculation for Ms. Casadei estimates that she is responsible for loss amounts of at least $550,000 and less than $1,500,000, the same loss range applied to Mr. Frazzetto. We do not dispute the government's loss amount calculation.

The Second Circuit has noted how loss amount calculations may overstate a defendant's culpability. In *United States v. Algahaim*, our Court of Appeals took issue with the Guidelines' loss amount scheme with respect to fraud offenses. 842 F.3d 796 (2d Cir. 2016). There, two defendants had their Guidelines offense levels increased from six to eighteen, driven entirely by their loss amounts. *Id.* at 800. The Court acknowledged that these increases were in compliance with the Guidelines Manual and that the Sentencing Commission had authority to use loss amount as the predominant determination of the adjusted offense level. *Id.* However, the Second Circuit proceeded to opine on whether loss-driven calculations make sense. It noted: "This approach, unknown to other sentencing systems, was one the Commission was entitled to take, but its unusualness is a circumstance that a sentencing court is entitled to consider." *Id.* (citing *Kimbrough v. United States*, 552 U.S. 85 (2007) (sentencing judge may make a non-Guidelines sentence if the judge disagrees with a Commission's policy determination)). The Court concluded: "Where the Commission has assigned a rather low base offense level to a crime and then increased it significantly by a loss enhancement, that combination of circumstances entitles a sentencing judge to consider a non-Guidelines sentence." *Id.* at 800 (citations omitted). The Second Circuit remanded the matter to permit the sentencing judge to consider whether the significant effect of the loss enhancement should be result in a non-Guidelines sentence. *Id.*

Here, Ms. Casadei faces a nearly identical Guidelines increase. While loss amounts can be a useful starting point, it, as *Algahaim* notes, may overlook other key criteria. In this instance,

we submit that the loss amount calculation grossly overstates Ms. Casadei's lesser role in the overall conspiracy. The calculation attributes to Ms. Casadei amounts that U.S. taxpayers failed to report, rather than amounts that Ms. Casadei failed to pay.

Further, Ms. Casadei was compensated under the Bank's "discretionary bonus" model. Under the "discretionary" model, her compensation was not tied directly to business generation. While she had a general interest in the financial health of BJB, her conduct would have been the same regardless of the amount of assets of the clients assigned to her.[10]

## RESTITUTION

As the presentence report notes, restitution in this case has been satisfied by BJB, which made a restitution payment in the amount of $247 million to the Internal Revenue Service. Presentence Report at ¶ 99. Accordingly, the presentence report writer is right that there is no need for an order of restitution here, as the Internal Revenue Service has been fully compensated for actual loss. Presentence Report at 26, ECF No. 54. Restitution is intended to compensate victims for their actual losses. *See United States v. Pescatore*, 637 F.3d 128, 138-39 (2d Cir. 2011); *United States v. Certified Envtl. Servs.*, 753 F.3d 72, 102-03 (2d Cir. 2014). Restitution to the government therefore should be reduced by the amounts paid to the tax authorities by the defendant or third parties. *See United States v. Cadet*, 664 F.3d 27, 34 (2d Cir. 2011).

Not only has BJB made a large restitution payment, but United States taxpayers who participated in the Voluntary Disclosure Program also repaid the IRS. Our understanding,

---

[10] Mr. Frazzetto noted in his sentencing memorandum that the loss amount calculations appear to be based on the model used in *United States v. UBS AG*, No. 09-CR-60033 (S.D. Fla.). Frazzetto Sent. Memo. at 16, Case No. 1:11-CR-00866-JSR, ECF No. 46. Given this circumstance, Mr. Frazzetto observed that the loss calculation in his case was based on information regarding a wholly different bank. *Id.* We take no issue with the loss amount calculations with respect to Ms. Casadei, but we note and agree with Mr. Frazzetto's observations about the applicable methodology used to calculate loss.

furthermore, is that the government does not believe that Ms. Casadei owes restitution. Furthermore, we understand that no similarly situated Swiss professional has been ordered to pay restitution.

Mr. Frazzetto was fined $6,000.  Other similarly situated Swiss bankers received comparable fines.  We have no opposition to a fine in a similar amount.

## CONCLUSION

For the foregoing reasons, we respectfully request that this Court adopt the presentence report's recommendation and impose a sentence of time served.  We also request that the Court waive Standard Condition No. 3, given that Ms. Casadei resides in Switzerland, and any other standards that are inapplicable because of Ms. Casadei's status as a foreign national residing abroad.

Date: June 11, 2018

Respectfully submitted,

*/s/ Barry Coburn*
Barry Coburn, Esq.
SDNY Bar code:  bc1981
COBURN & GREENBAUM, PLLC
1710 Rhode Island Ave., NW
Second Floor
Washington, DC 20036

99 Hudson Street
Fifth Floor
New York, NY 10013
barry@coburngreenbaum.com
(202) 643-9472

23

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the foregoing will be served upon Sarah Paul, Esq.,

AUSA, counsel for the government, this 11th day of June, 2018, via ECF and email.

*/s/ Barry Coburn*
Barry Coburn, Esq.